DeBlanc, J.
In 1821, the Legislature of the State incorporated— for charitable purposes and the promotion of mechanical arts — the New Orleans Mechanics’ Society, whose existence was'then limited to twenty years, and — thereafter—extended to the 17th of February, 1871.
In 1850 — by an act approved on the 21st of March, the Governor of the State was authorized and directed to transfer and deliver, and he *628 did transfer and deliver to the New Orleans Mechanics’ Society, the possession and occupancy, for ever, of a lot of ground situated in this city and belonging to the State.
By sec. 3 of said Act, it was provided: “ That the said Mechanics’ society shall immediately after the execution of the donation, begin, and within three years thereafter, complete the construction of a brick or stone building on said ground, suitable for a library, lecture room, and cabinet of natural history and mechanical inventions, and the said Society shall, as soon as said building is completed, establish and maintain a library for the use of the mechanics of N ew Orleans, and an annual course of lectures on the physical sciences and particularly those connected with agriculture and the mechanical arts.”
And by 'sec. 4: “ That if the sai.d Mechanics’ Society shall fail to do and perform any of the acts required of it by the second section of this act, then the land of which they are hereby given the possession and occupancy, shall be taken possession of by the Governor on behalf of the State, and all the buildings or improvements made thereon, shall be forfeited for the use of the State.”
In 1857, a building which — in obedience to one of the conditions of the act of 1850, had been, by the society, erected on the ground thus transferred by the State, was destroyed by fire, and the Legislature appropriated the sum of ten thousand dollars, to aid the society in rebuilding its destroyed edifice, on the conditions imposed by the Legislative act. When the war broke out between the American States, that edifice — known as the Mechanics’ Institute — had not been completed.
In 1867, the State, or — as contended by its counsel — the State officials, who — before that date — had leased the Institute, procured an extension of the term of said lease; and — by a joint resolution of the Legislature — the’owners of the Institute were required to have it properly finished for the first day of the month of November of that year. To again assist them in so doing, an additional appropriation of fifteen thousand dollars was placed at their disposition.
These appropriations not being sufficient, the society, in order to comply with the joint resolution already referred to, negotiated three of its own notes, secured by a conventional mortgage on two lots of ground, that transferred to it by the State, another purchased from Samuel Locke, and the buildings thereon erected. These notes were negotiated to A. Rochereau & Oo. and the Factors’ and Traders’ Insurance Association. They advanced the money needed by the Mechanics” Society, and — according to the evidence — the money so advanced was used for exclusively the completion of the unfinished edifice.
- On the 17th of February, 1871, the charter of the Society expired. As the charter was silent as to the mode of the liquidation of its affairs, *629 its creditors — who admit its undenied solvency — applied to the late Superior District Court to appoint a liquidator to take charge of, and settle its affairs. Their application was granted, and the court’s appointee authorized to sell the Society’s property to pay its debts.
On the 10th and 16th of February, 1876, the holders of the three negotiated notes brought suit against the liquidator, for the recognition and enforcement of the mortgage securing the payment of their claim-To their demand, he opposed the plea of prescription. As — however— by the effect of a payment of interest, that of the notes had been — by mutual consent of the debtor and creditors — extended until the expiration of the charter, on the 17th of February, 1871, prescription — though apparently in sight — had not been acquired, when — on the 16th of February, 1876, the creditors’ citations were served on the liquidator. His exception was properly overruled, and — on the 5th of June — they obtained judgment for the amount of their respective claims, with recognition of their mortgage.
On the 14th of November, the court ordered the sale of the mortgaged property, and — between the date of that order and the sheriff’s advertisement of the sale so ordered, the very same property which — it is urged — has not ceased to belong to the State, was — nevertheless— seized and advertised for sale, to satisfy the taxes thereon levied by the State, and which then — with the costs incurred — amounted to three thousand three hundred and twenty-eight dollars and thirty five cents.
To protect their rights, the creditors were compelled to pay those taxes, and — this done — the sheriff proceeded to advertise the sale ordered by the Superior District Court; but the creditors had hardly made the peremptorily exacted payment of State taxes, and thus removed what they considered as the only obstacle to the exercise of their rights, than a suit was instituted — in conformity to a concurrent resolution of the Legislature of 1875 — to forfeit to the State the mortgaged property, and enjoin its sale under the order of the 14th of November. The reasons alleged to obtain the forfeiture are, that the Mechanics’ Society has failed:
First — To maintain a library for the use and benefit of the mechanics of New Orleans and of the citizens of Louisiana.
Second — To maintain a course of lectures on the physical sciences, and particularly those connected with agriculture and the mechanical arts.
Third — To keep the building erected by the aid of the money appropriated by Act No. 126 of 1857 “ constantly insured to the largest amount possible,” as required and contemplated by said Act.
To the action filed in behalf of the State, the creditors excepted on eight different grounds, one of which is that, “ by act of the Legislature, *630 promulgated on or about the 15th March, 1877, the State has revived the charter of the New Orleans Mechanics’ Society for a term of fifty years, and has specially recognized its rights to the property claimed in this suit, and has enlarged the franchises and privileges of the society, and left it untramrneled with any particular conditions as to the use of the property herein claimed, and has, by said Act, waived and abandoned the right, if any it ever had, to claim the rescission of any of the aforesaid donations or the forfeiture of any property of said Society, and there is no authority, if any ever existed, for the prosecution of this suit.”
We concur in the assertion that — prior to the expiration of its charter — the Mechanics’ Society did not comply with all of the conditions attached to the State donations: we do more — we admit that the society did itself violate, and that — at the suggestion and with the assistance of those who then represented the State, it again violated some of the conditions imposed upon it by the laws invoked to forfeit its charter and confiscate its property; but can we disregard the fact that — as to the most important of the several violations now urged against it — its avowed accomplice was a sovereign State? That accomplice would not be allowed — if it so intended — to take advantage of a wrong, in the perpetration of which the largest share should have to be charged to its own credit. The State has — however—undoubtedly excused and expressly waived the forfeiture which — to no inconsiderable extent, was incurred at the instigation of its mandataries.
The act promulgated in 1877 may be — as contended — of doubtful parentage: it may be that it was, through the door of fraud, that it stole its admission in the statute book — but it is there, and — since its admission — two Legislatures have met and adjourned, without even attempting to repeal it. Their failure to do so amounts to its ratification, and— were it a legislative bastard — it is now too late to contest its legitimacy. That act, which revived for fifty years the expired charter of the society, was passed — not with only a simple notice of the causes which might have justified the forfeiture sought to be obtained, but with notice that a suit was pending — at the date of its adoption — to enforce the rights which, it is alleged, have reverted to the State, on account of said forfeiture. Under these circumstances, the adoption of the act promulgated in 1877 operated — it is evident — as a waiver of any incurred penalty.
16 Serg. 140 — 1 Pa. 426 — 9 Wend. 351 — 2 Pa. 546 — Abbott’s Dig. of Corp., No. 54, pp. 354 and 355.
That act is not unconstitutional: its title expresses its objects-rit impairs no obligation, divests no vested right: it neither revives nor amends — by reference to its title — any repealed or existing law, nor has *631 it a single one of the characteristics of the ex post facto or retroactive legislation prohibited by the constitution. It injuriously affects no one, invades no right, and is not within the prohibition.
2 Pet. 380 — 8 Pet. 88 — 11 Pet. 420 — 10 IT. 395 — 17 H. 456 — 2 Pa. 74— 4 Wall. 172.
The State alone was interested in the enforcement of the forfeiture of the society’s charter, and — in advance of any decree declaring that forfeiture — the Bepresentatives of the State have — in the exercise of the powers delegated to them — renounced, in its name, to any and every right which it might have acquired under the expected decree. Can the courts of the State ignore that legislative renunciation, and destroy — in obedience to the concurrent resolution of 1875 — the charter which, in 1877, was revived for half a century? Most assuredly not. The act adopted in 1876 and promulgated in 1877 is more than an ordinary estoppel: it is the published evidence of an absolute abandonment — by the State — of the action filed in its behalf against the New Orleans Mechanics’ Society.
Did the society acquire — by the donation from the State — the unqualified and perfect owneship of the lot of ground on which its institute is partly built ?
Acting under the authority of an act of the Legislature, the Governor of the State transferred to the society, and forever, the possession and occupancy of said lot. These terms, as to the property donated— transferred a right by which it was to be perpetually held by the donee, and so held to the perpetual exclusion of all others, not excepting the State.
In Arnauld vs. Delachaise, this court — adopting the views of eminent commentators on the civil law, said with them: “ that perpetuity is contrary to the very essence of usufruct, and if the entire enjoyment of an estate has been expressly bequeathed in perpetuity to a community, the right thus bequeathed would have only the name of usufruct, and the property itself would pass by that description.”
“On voit — as remarked by Mourlon — combien serait restreinte 1’utilité de la propriétó, si elle était a perpétuité dépourvue de ses attributs essentiels, le jus utendi et le jus fruendi. Dans la plupart des cas, son utilité serait absolument nulle pour celui qui en serait nanti. Son effet se bornerait a géner l’usufruitier dans ses projets d’amólioration sur la chose. II est done de l’essence de la propriété qu’elle ne soit point perpetuellement róduite au jus abutendi, et, réciproquement, de l’essence de Tusufruit d’etre temporaire. ”
Mourlon, Examen du O. N. vol. 1, p. 720.
After the donation from the State to the society, of the possession and occupancy — forever—of the lot described in the act of 1850, who *632 would have consented to purchase, from the State, that — which we are told — remained of its entirely shorn title, and of its more than naked ownership ? The possession willingly relinquished and transferred by the proprietor, and which — by an express stipulation assented to by him — is to be perpetually enjoyed by his transferee, and — after the latter — by his legal representatives, and from generation to generation, is far more valuable than the nameless ownership retained by the proprietor, and which — by such a stipulation — would, and forever, be divested of the attributes which constitute its value. The pretended ownership, which — at no time — is to be reunited to a permanently severed and transferred possession, is not an ownership known to, or sanctioned by our laws.
The donation from the State to the society was a donation of the entire right which the State had in and to the lot. The State so construed it: the State caused it to be assessed as belonging to the society, levied taxes upon it, and seized it for the satisfaction of the taxes so levied. The Legislature of the State rented it from the society, and it is manifest, the State — as to the property donated — reserved but one right, one which it could exercise only in case the society failed to do and perform any of the acts required of it by the second section of the act of 1850, and that was the right to forfeit — for its own use — the buildings and improvements which were to be erected-on said property, and to resume the possession which — otherwise—was to be perpetually enjoyed by the donee.
In 1877 — after its resurrection — the society intervened in this suit, and — for the first time — contested the validity of the proceedings by which it was put in liquidation. The terms of its intervention, which was not pressed in the lower court, and which — here—seems to have been abandoned, are indefinite and vague. It could not deny that its charter had expired by limitation, that it was solvent, that neither its charter nor the general laws of the State contained any provision as to the mode of the liquidation- of its affairs. It does not deny the correctness of its creditor’s demands, which was fully established by the declarations of its president and secretary; and it is shown that if those creditors had not paid, out of their own funds, the taxes levied and due on the society’s institute — the whole of its immovable property which— when that payment was made — had already been seized for said taxes, would have been sold under that seizure.
The appointment of a liquidator, under these circumstances, was— not only proper — but indispensable, as well in the interest of the society as in the interest of its creditors, and — as held in Stark vs. Burke et als. —“ there can be no question as to the power of the court, to appoint a receiver, ex proprio motu, in order to prevent the confusion and dilapi *633 •dation consequent upon the abandonment of a company’s affairs, produced by the inefficiency of the law,” etc. 5 A. 740 — 3 A. 182.
Had the society the power to borrow money and to mortgage its property to secure its reimbursement ?
By the act of the 17th February, 1821, incorporating the society, it was declared “ capable at all times hereafter of taking, receiving, purchasing, and possessing and enjoying, all kinds of estates and effects whatsoever, whether real or personal, to an amount not exceeding •■§200,000, and the same to sell, grant, convey and dispose óf,” etc.
“ A corporation authorized to dispose of its property may, in general, ■dispose of any interest in the same it may deem expedient, having the ■same power in this respect as an individual. Thus it may lease, grant in fee, in tail, or for term of life, mortgage, and though insolvent, assign its property in trust for the payment of its debts, defeating by preference where the law allows it, even the priority of the State,” etc.
Angelí & Ames, 191 — 8 Ohio, 548--5 Wend, 590 — 1 Watts, 385 — 15 Inch 459-32 N. H. 484 — 10 Allen 448 — 26 A. 738.
In Bezon vs. Pike et als. our predecessors said : ‘‘ A corporation ;as an intellectual being, is vested with the powers necessary for the purposes for which it was incorporated, and can act only through its offi•cers. The authority to make loans, execute notes, pledges, etc., by corporations, is not derived from or regulated by the law of mandate •as contained in the .Civil Code, but from the law of its creation, and — if •not conferred by the express letter of its charter — may be inferred or implied from the powers actually conferred.”
23 A. 789.
If it be true — which we do not concede — that the society was not ••authorized — by the law of its creation — to borrow the money which it needed to complete the improvements essential to the purposes for which it was organized and to its very existence, the lacking authority 'was — impliedly—delegated to it by the joint resolution adopted by the Legislature on the 28th of February, 1867, which declared “ that the Mechanics’ Society — the owners of the building now occupied as the ■State House, be and it is hereby required and empowered to make the 'necessary repairs, and to finish all the rooms throughout said building, the same to be ready for occupation on or before the first of November of that year.”
It was to enable the society to do — within the space of time indicated in the resolution — -that which it was thus empowered and required to do, that it subscribed and discounted the notes held and sued upon by A. Rochereau & Co. and the Factors’ and Traders’ Insurance Association, and it was — partly at least — with the proceeds of said notes that the authorized repairs were made and the edifice completed.
*634 The claims o£ those creditors are just, the mortgage securing those claims valid: but, though the State has parted with the ownership of the hypothecated property, it has done so on specified conditions; and the enforcement of that mortgage can — in no way — change or alter those conditions. The society’s rights in the property cannot be enlarged, those of the State cannot be reduced, by a sale made to satisfy said mortgage; and no purchaser can — by such a sale — acquire more or otherwise than the society did by the donation from the State. An already accrued forfeiture has been waived; but, for any legal cause which may have arisen, or which might arise from the date of that waiver, the State still retains the right to enforce the stipulated forfeiture.
It is, therefore, ordered, adjudged and decreed that the judgment appealed from is affirmed with costs.